## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| FRANKLIN SEAN SMITH, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | Case No. 1:23-cv-73 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| JASON CLENDENION, | ) | |
| | ) | |
| *Respondent*. | ) | |

## M E M O R A N D U M

Petitioner Franklin Sean Smith is a Tennessee inmate proceeding pro se on a federal habeas

petition pursuant to 28 U.S.C. § 2254 in which he challenges the constitutionality of his

confinement under 2019 Cocke County judgments of conviction for aggravated rape of a child,

aggravated sexual battery, and incest. (Doc. 1.) Having considered the submissions of the parties,

the State-court record, and the law applicable to Petitioner's claims, the Court will not hold an

evidentiary hearing,[1] the petition will be **DENIED**, and this action will be **DISMISSED**.

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

In 2018, a Cocke County grand jury indicted Petitioner on one count of aggravated rape of

a child, one count of aggravated sexual battery, and one count of incest. (Doc. 11-1 at 4–7.) The

Tennessee Court of Criminal Appeals ("TCCA") recounted the evidence admitted at Petitioner's

trial, as follows:

---

[1] "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules"); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (providing an evidentiary hearing not required where record refutes the petitioner's allegations or otherwise precludes habeas relief).

[Petitioner]'s wife, Mrs. Smith, testified she and [Petitioner] had three children, E.S., H.S., and A.S. The events giving rise to this matter occurred when the victim, H.S., was three years old. The family lived in a camper van on the side of a hill while [Petitioner] was building a permanent, bunker-style home on top of the hill. The two homes were "at least a football field length[ ]" apart. There was a locked cattle gate at the entrance to the property. On September 16, 2017, Mrs. Smith and [Petitioner] were playing outside with their children near the bunker. Mrs. Smith left to cook supper and [Petitioner] continued playing with the children. At some point, E.S. and A.S. joined Mrs. Smith in the camper. [Petitioner] and H.S. remained on the hill. Mrs. Smith became distracted on her computer and delayed dinner. She called [Petitioner] on the phone and asked if she could just make oatmeal. While Mrs. Smith was fixing dinner, [Petitioner] and H.S. walked into the camper. H.S. immediately said, "momma, my pee-pee hurts." Mrs. Smith took H.S. into the bedroom to apply ointment to her "pee-pee" and closed the sliding door. Shortly thereafter, [Petitioner] opened the door and asked Mrs. Smith why she had shut it. Mrs. Smith responded that she did not want E.S. to see her applying cream to H.S. [Petitioner] left the room. Mrs. Smith wiped H.S., applied ointment, and changed her underwear. H.S. told Mrs. Smith her "pee-pee" was hurting because [Petitioner] "wiped" her earlier. Mrs. Smith testified that H.S. "rolled over on all fours" and "started thrusting her hips and making like a dry humping motion[.]" H.S. continued saying, "daddy do this, daddy do this and daddy wipe[d] me." Mrs. Smith testified that H.S. told her [Petitioner] took off his pants and H.S.'s pants and underwear. H.S. continued to make the thrusting motion.

Mrs. Smith told H.S. not to talk to [Petitioner] about the incident. Mrs. Smith left the bedroom to finish preparing the oatmeal and began to panic. [Petitioner] asked her what was wrong and Mrs. Smith tried "not to let on[.]" Mrs. Smith took H.S. and A.S. to the bunker while E.S. and [Petitioner] remained in the camper. Mrs. Smith testified that once they entered the bunker, H.S. pointed to a red cooler on the floor and said, "That where daddy tell me to lay down." Mrs. Smith asked H.S. how [Petitioner] wiped her and H.S. took Mrs. Smith to a closet and "pointed straight up." Mrs. Smith reached up to the top shelf in the closet and found a hand towel and a package of wet wipes.

Mrs. Smith and the girls walked back to the camper. [Petitioner] asked Mrs. Smith what H.S. had said in the bedroom. Mrs. Smith asked to speak with [Petitioner] outside. Once outside, Mrs. Smith said, "H.S. said you assaulted her." Mrs. Smith recalled that [Petitioner] scoffed and said "assaulted her?" Mrs. Smith, crying, asked [Petitioner] to tell her he "didn't do this." Mrs. Smith testified [Petitioner] said, "It doesn't matter, I'm not going to explain myself." Mrs. Smith said [Petitioner] grew angry and told her "everything was [her] fault and that [she] wouldn't read [her] Bible and that he couldn't be the Christian or the man he was supposed to be because of [Mrs. Smith.]" Mrs. Smith again pleaded with [Petitioner] to deny assaulting H.S. Mrs. Smith said [Petitioner] "got right up in [her] face and he said, [']As a matter of fact, I did do it and it's all your fault.[']"

2

[Petitioner] went into the camper and screamed goodbye to E.S., saying, "[Y]ou'll never see me again and this is all your mother's fault." [Petitioner] then left the property. Mrs. Smith called 911, [Petitioner]'s brother, and [Petitioner]'s parents. She placed the children into the car and hid in her neighbor's driveway. Mrs. Smith drove to the cattle gate as [Petitioner] returned in a large SUV. Mrs. Smith reversed her car upon seeing [Petitioner], but then stopped and got out of it. [Petitioner] asked for Mrs. Smith's phone.

Two officers with the Cocke County Sheriff's Department arrived while [Petitioner] and Mrs. Smith were talking. The officers separated Mrs. Smith and [Petitioner] to interview them.

Cocke County Sheriff's Department Detective Robert Thornton arrived and interviewed Mrs. Smith along with the officer. Mrs. Smith walked around the property with Detective Thornton and the officer. They located the hand towel, package of wet wipes, and H.S.'s underwear. The officers collected the items as evidence. Detective Thornton escorted Mrs. Smith and the children to the hospital in Newport. H.S. was subsequently transferred to East Tennessee Children's Hospital in Knoxville for a physical evaluation.

On cross-examination, Mrs. Smith explained H.S. had "redness in her pee-pee area and whenever they evaluated her at the hospital, I asked specifically if she had a yeast infection and the doctor told me no, that it was injury." Mrs. Smith denied that H.S. had a rash. Mrs. Smith read a statement she had written with Detective Thornton in which she stated, "[H.S.] said her pee-pee had hurt and she had been battling a rash[.]"

Detective Thornton testified that Mrs. Smith provided a statement to him while they walked around the property. The statement was admitted as an exhibit and related what H.S. had told Mrs. Smith. Detective Thornton was present during an interview between H.S. and a child advocate at Safe Harbor, a child advocacy center, on September 21, 2017. The State introduced a video recording of the interview and it was played before the jury with no objection. There is a seven to eight second delay between the audio and the visual display in the recording. During the interview, H.S. stated that [Petitioner] removed his pants and her pants and underwear. When asked what [Petitioner] did to her, H.S. imitated a thrusting motion. H.S. said that what [Petitioner] did felt "not good." H.S. said that afterwards, [Petitioner] wiped her "pee-pee."

Dr. Lise Christensen conducted the physical evaluation of H.S. at East Tennessee Children's Hospital on September 17, 2017. Dr. Christensen testified that she found signs of trauma to H.S.'s genitals, noting an abrasion and "a little scratch" on two different areas of her genitals. She explained that these injuries were "consistent with some kind of force or injury to that area." Dr. Christensen did not find H.S. suffering from a rash or any other illness that would have caused her injuries. Dr. Christensen testified that she conducted a swab of H.S.'s external genitalia to

3

collect a specimen from the area. She elaborated, "It would be very unlikely to have full penetration at her age. Most likely the trauma is done on the outside and that's more appropriate to obtain the specimen on the outside." On cross-examination, Dr. Christensen testified that H.S.'s hymen was intact. She again confirmed H.S. did not have any infections or rashes on her genitalia. On redirect examination, Dr. Christensen testified that H.S.'s injuries were "consistent with sexual assault." On recross-examination, Dr. Christensen stated her analysis was based on her physical examination of H.S. and information provided by Mrs. Smith.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Kim Lowe examined the swabs of the victim's external genitalia and the victim's underwear. Agent Lowe "confirmed the presence of limited spermatozoa[ ]" on the external genitalia swabs and "confirmed the presence of spermatozoa" on the victim's underwear. Agent Lowe said that she tested the underwear in the front portion of the crotch region. After receiving buccal swabs of [Petitioner], Agent Lowe conducted a DNA comparison and found [Petitioner] to be the major contributor for the sperm found in the underwear. Agent Lowe testified that either [Petitioner] or someone from his paternal bloodline was the contributor for the sperm found on the external genitalia swabs. Agent Lowe testified that she did not test the hand towel or wet wipes because the internal policy was to test areas closest to the individual. Because she found "a positive" on the internal areas, she did not test any external items.

[Petitioner] testified that on September 16, he and the children were playing up on the hill while Mrs. Smith was in the camper. [Petitioner] said Mrs. Smith joined the family and that they entered the unfinished bunker together. [Petitioner] recalled reminiscing with Mrs. Smith about a sexual encounter from the prior year. [Petitioner] testified that Mrs. Smith aroused him but then said she had to go down and cook dinner. [Petitioner] said that Mrs. Smith left with the children. Because [Petitioner] was still aroused, he "decided to take care of it." [Petitioner] claimed nobody was in the bunker when he masturbated. [Petitioner] testified that afterwards, he went to get wet wipes and saw H.S. standing at the door. [Petitioner] did not believe H.S. saw him masturbate and proceeded to clean up the mess on the floor with the wet wipes and throw them under the window.

[Petitioner] testified that once he noticed H.S., they talked the whole time and held hands on their way down to the camper. [Petitioner] claimed he told Mrs. Smith that H.S. may need to be cleaned because "[a]s she[ was] walking down, she told me her pee-pee itched. She didn't say it hurt. She said it itched." [Petitioner] testified that Mrs. Smith said she would clean H.S. after changing A.S.'s clothes. He explained that H.S. contracted yeast infections very often and that they would usually treat the infection with coconut oil. [Petitioner] testified that H.S. had a yeast infection a few days prior to September 16.

[Petitioner] recalled that after Mrs. Smith cleaned H.S., Mrs. Smith and H.S. went up the hill together. [Petitioner] remembered Mrs. Smith going back and forth

between the camper and the bunker a few times while he was on the computer and eating dinner. After dinner, Mrs. Smith asked to speak with [Petitioner] outside about a "funny thing." Once outside, Mrs. Smith told [Petitioner] H.S. had imitated a thrusting motion and said, "Daddy did like this." [Petitioner] testified he didn't say anything at first. Then, he said H.S. walked in on him while he was masturbating in the bunker. [Petitioner] said, "She asked me did you molest our daughter. Those were her exact words. And I said no. And I proceeded to say that she wouldn't understand and I was going to say something more about what we were going through, but as I said, you wouldn't understand." [Petitioner] recalled that he sat down in a chair outside the house and Mrs. Smith was infuriated with him. [Petitioner] testified that Mrs. Smith repeatedly asked him if he molested H.S. [Petitioner] said he did not respond and went inside to get his keys. While inside, he told E.S., "mommy and daddy were arguing because mommy stopped reading the Bible and stopped loving God[.]"

[Petitioner] admitted he sarcastically told Mrs. Smith he molested H.S. because Mrs. Smith had upset him. When asked whether he thought this was an appropriate response, he said, "We're always sarcastic." [Petitioner] testified that he did not rape or touch his daughter in any way. [Petitioner] said that after the argument, he went for a drive to cool off.

On cross-examination, the State introduced portions of letters [Petitioner] wrote to his father-in-law and wife. In the letter to his father-in-law, [Petitioner] theorized as to how his sperm arrived on H.S.'s underwear. He first claimed Mrs. Smith planted his sperm on H.S.'s underwear. [Petitioner] read another section, offering that while he and H.S. were holding hands walking down the hill, his sperm likely transferred onto her hand. Then, due to her yeast infection, she scratched her genitals and the sperm transferred to her underwear. When asked which explanation was true, [Petitioner] said, "You'll have to ask my wife." In the letter to his wife, [Petitioner] suggested she may have planted the evidence. [Petitioner] then read, "I suppose it's also possible as corrupt as Cocke County is that it was planted or falsified."

On redirect examination, [Petitioner] testified that he thought of multiple explanations as to how the sperm got in his daughter's underwear "to protect [his] wife." He said he wanted to give his wife "a way out" and to keep the family together.

At the conclusion of the proof, the jury found [Petitioner] guilty on all charges. Following a sentencing hearing, the trial court imposed a sentence of 60 years for aggravated rape of a child, 12 years for aggravated sexual battery, and [6] years for incest. The trial court ordered the sentences to run concurrently. [Petitioner] filed a motion for new trial, alleging the evidence was insufficient to support his convictions. In an amended motion for new trial, [Petitioner] also raised the issues of prosecutorial misconduct, and double jeopardy. After a hearing on the motion for new trial, the court entered a written order denying relief.

*State v. Smith*, No. E2019-01515-CCA-R3-CD, 2022 WL 1567280, at *1–4 (Tenn. Crim. App. May 18, 2022) (footnote omitted), *perm. appeal denied* (Oct. 19, 2022).

The TCCA affirmed Petitioner's convictions on direct appeal. *Id.* at *4. The Tennessee Supreme Court denied Petitioner permission to appeal. (Doc. 11-23.) Petitioner did not file a petition for writ of certiorari in the Supreme Court, and he did not seek post-conviction relief or other collateral review.

Thereafter, Petitioner filed a timely federal habeas petition raising four grounds for relief: (1) insufficiency of the evidence; (2) prosecutorial misconduct; (3) ineffectiveness of counsel; and (4) cumulative error. (*See* Doc. 1; Doc. 2 at 7.) The Court initially dismissed the petition without prejudice because, at the time Petitioner filed his petition, he had not yet exhausted all available State-court remedies. (Doc. 6.) Petitioner sought reconsideration of that dismissal, arguing that he satisfied the exhaustion requirement through the direct review process. (Doc. 8.) Given Petitioner's assertions, the Court granted Petitioner's motion to reopen and ordered Respondent to file a response to the petition and the State-court record. (Doc. 9.) Respondent subsequently filed the State-court record (Doc. 11) and his response to the petition (Doc. 14), to which Petitioner replied (Doc. 16). This matter is now ripe for review.

## II.    LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007). This review is limited to the record that was presented to the state court when it resolved the claim. *See Cullen v. Pinholster*, 563 U.S. 170, 181–83 (2011); *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013) ("*Pinholster* plainly bans [any] attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court."). And when evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Williams*, 529 U.S. at 410–11. Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal

habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729, 731–32, 735 n.1 (1991).

The exhaustion principle requires a petitioner to have presented each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 302–03 (1984)). The claim must have been "fairly presented" in that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state and the federal courts. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). In Tennessee, presentation of the claim to the TCCA satisfies this requirement. Tenn. S. Ct. R. 39.

But if a prisoner never presented a claim to the TCCA and a state procedural rule now bars presentation of the claim, because, for example, it is barred by Tennessee's one-year statute of limitation on post-conviction actions or its prohibition against second petitions, that claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62

8

(1996); *Coleman*, 501 U.S. at 731–32, 750; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

In some circumstances, a procedural default may be circumvented to allow federal habeas review of a claim. But that is appropriate only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977).

The exception for a fundamental miscarriage of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is "actually innocent of the underlying offense[.]" *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, a viable claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

With regard to the "cause and prejudice" exception for procedural default, the "prejudice" sufficient to overcome a default must be actual, with the petitioner bearing "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in

9

original).  And "cause" for a default is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules.  *See Coleman*, 501 U.S. at 753.

When a federal habeas claim is not adequately developed in state court, the federal habeas court may not consider any evidence beyond the state-court record to address the merits of the claim unless the petitioner satisfies the requirements in 28 U.S.C. § 2254(e)(2).  *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022); *see also Henderson v. Mays*, No. 12-5028/14-5911, 2023 WL 3347496, at *18 (6th Cir. May 10, 2023) (concluding that *Shinn* foreclosed consideration of evidence outside of state-court record that did not meet § 2254(e)(2)'s requirements "regardless whether the issue was adjudicated on the merits or procedurally defaulted").  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Thus, federal courts may allow factual development of a claim "only if [the petitioner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met."  *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004).

With these standards in mind, the Court turns to a consideration of Petitioner's claims.

10

### III.    ANALYSIS

#### A.    Sufficiency of Evidence

Petitioner first claims that "[t]he State's case against [Petitioner] failed to satisfy its Fourteenth Amendment obligation to prove beyond a reasonable doubt every fact necessary to constitute the crime within which [Petitioner] was charged." (Doc. 1 at 5.)  In support of this claim, Petitioner asserts that the charge of aggravated sexual battery is "unfounded[,]" that false testimony was presented by Dr. Christensen, that the out-of-sync forensic interview was "altered evidence," and that the State argued "false evidence" in its rebuttal closing argument. (*Id.* at 5–6.)

On direct appeal, Petitioner argued that the evidence was insufficient to support his convictions requiring penetration. (Doc. 11-14 at 72.)  The TCCA framed Petitioner's claim as a challenge to the sufficiency of the evidence "to support his conviction for aggravated rape of a child." *Smith*, 2022 WL 1567280, at *10.  The appellate court affirmed Petitioner's conviction, concluding that the evidence at trial "overwhelmingly supported" the finding of unlawful sexual penetration. *Id.*

Respondent argues that, to the extent "Petitioner now challenges the legal sufficiency of evidence to support his convictions of aggravated sexual battery and incest, that portion of this claim is procedurally defaulted because Petitioner failed to exhaust his State-court remedies on the federal claim while they remained available to him." (Doc. 14 at 18.)  The Court agrees with Respondent as to Petitioner's aggravated sexual battery conviction, as in State court Petitioner only challenged the sufficiency of the evidence concerning convictions requiring proof of penetration. *See Smith*, 2022 WL 1567280, at *10.  And the offense of aggravated sexual battery does not require proof of penetration. (Doc. 11-1 at 5.) *See* Tenn. Code Ann. § 39-13-504 (2017) (providing

offense includes, as relevant here, "unlawful sexual contact" with a victim less than thirteen (13) years of age); Tenn. Code Ann. § 39-13-501(6) (2017) ("'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]").

Petitioner attempts to avoid the procedural default of aggravated sexual battery portion of this claim, asserting that is not defaulted because it was raised on direct appeal as a double jeopardy violation. (Doc. 16 at 10.) But to avoid procedural default, a petitioner must have presented his claim in state court under the same legal theory in which it is presented in federal court. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Petitioner did not do so in this case. And because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust this claim, the claim is technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657 ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period).

Therefore, the Court considers Petitioner's federal habeas challenge to the TCCA's rejection of his sufficiency of the evidence claims as to his convictions for aggravated rape of a child and incest.[2] Criminal defendants have a right not to be convicted of a crime "except upon

---

[2] Although the TCCA framed Petitioner's claim as challenging his conviction for aggravated rape of a child, Petitioner argued to the TCCA that the evidence was insufficient to support his convictions for the offenses requiring proof of penetration. (*See* Doc. 11-14.) Therefore, the Court presumes Petitioner's challenge to his incest conviction was also adjudicated on the merits. *See, e.g., Johnson v. Williams*, 568 U.S. 289, 292–93 (2013). Moreover, proof of penetration supporting the aggravated rape charge is equally applicable as proof of penetration required for the incest charge.

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [they are] charged." *In re Winship*, 397 U.S. 358, 364 (1970). A challenge to the legal sufficiency of the evidence underlying a conviction is governed by the Supreme Court's holding in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

This standard acknowledges the factfinder's role to resolve all conflicts in testimony, weigh the evidence, and "draw reasonable inferences from basic facts to ultimate facts." *Id.* Thus, the reviewing court does not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [their] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

A habeas court reviewing a properly exhausted *Jackson* claim affords it a doubly deferential standard of review. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, a court reviewing the verdict can set it aside "only if no rational trier of fact could have agreed with the jury." *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). Second, a federal habeas court must account for the statutory deference under § 2254(d) allotted to the state-court's review of the jury's findings. *Id.* Thus, a habeas court reviewing the state court may overturn the state court's decision "only if the state court decision was objectively unreasonable." *Id.* (internal quotation marks omitted).

On direct appeal, Petitioner argued that the evidence put forward was legally insufficient to support his conviction of the offenses requiring penetration—incest and aggravated rape of a

child.  (Doc. 11-14 at 69–75.)  At the time of Petitioner's offense, aggravated rape of a child was defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less."  Tenn. Code Ann. § 39-13-531(a) (2017). Incest was defined, in relevant part, as "sexual penetration" "with a person, knowing the person to be. . . [t]he person's natural . . . child[.]"  Tenn. Code Ann. § 39-15-302 (2017).  "Sexual penetration" was defined at the time as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's or any other person's body, but emission of semen is not required[.]"  Tenn. Code Ann. § 39-13-501(7) (2017).

At trial, Mrs. Smith testified that on September 16, 2017, her three children—E.S., H.S., and A.S.— were playing relatively near a partially underground bunker Petitioner was building on their property.  (Doc. 11-5 at 37–38.)  She stated that she and two of the children returned to their RV on the property to cook dinner while the victim and Petitioner remained up on the hill.  (*Id.* at 38–39.)  Ms. Smith explained that when Petitioner and the victim returned to the camper, the victim told Mrs. Smith that her "pee-pee hurts."  (*Id.* at 39.)  Mrs. Smith testified that when she took the victim to the back room of the camper to put some cream on her, the victim said, "[M]y pee-pee is hurting because what daddy was doing to me."  (*Id.* at 39–40.)  She stated the victim also said, "Daddy wiped me"  (*Id.* at 40.)  Mrs. Smith testified that when she asked the victim what she meant, the victim said, "Well, daddy do like this" and she "rolled over on all fours" and started "thrusting her hips making like a dry humping motion"  (*Id.*)  Mrs. Smith testified that the victim "was talking about that her daddy took her pants off and took her panties off . . . and his panties off."  (*Id.* at 41.)  The victim kept making the same motion saying daddy wiped her with a wet wipe and towel in the bunker he was building.  (*Id.*)

14

Mrs. Smith stated that it "didn't make sense" to her that the victim talked about Petitioner "wiping" the victim, because Petitioner approached Mrs. Smith approximately "a year before" and told Mrs. Smith that "he didn't want to change their diapers anymore and that he didn't want to help them with any of that, that they were girls and he didn't understand it." (*Id.* at 41–42.) Mrs. Smith testified that this also "didn't make sense" because "the house isn't finished[,]" meaning "[t]here was no running water, no electricity[,]" and no wet wipes or towels were in the house. (*Id.* at 41–42.) Mrs. Smith testified that upon hearing the victim's description of events she felt that "something awful had happened." (*Id.* at 42.)

Mrs. Smith testified that, after hearing this, she "just started panicking" and took the victim and A.S. up the hill to play while leaving Petitioner in the camper with their remaining child. (*Id.* at 42, 43.) She stated that when she opened the door to the unfinished bunker, the victim pointed to a red cooler on the floor and said, "That where daddy tell me to lay down." (*Id.* at 43.) Mrs. Smith testified that she asked the victim what Petitioner wiped her with, and the victim walked down the hall to "what was going to be [their] closet" and pointed "straight up" at some shelves. (*Id.*) Mrs. Smith testified that she "put [her] hand up there and there was a hand towel and a package of wet wipes." (*Id.*)

Mrs. Smith testified that she returned to the camper and Petitioner asked her what the victim told her. (*Id.* at 44.) Mrs. Smith said that she and Petitioner spoke alone outside, where she told Petitioner that the victim "said you assaulted her." (*Id.*) Mrs. Smith testified that Petitioner said he was "not going to explain [himself]" and "got mad and madder and madder." (*Id.* at 45.) Ms. Smith stated that in response to her asking Petitioner whether he had a problem, Petitioner "got right up in [her] face and said, 'As a matter of fact, I did do it and it's all your fault.'" (*Id.* at 46.)

15

Ms. Smith testified that she called law enforcement. (*Id.* at 47.) Detective Thornton testified that he responded to the scene and collected evidence, such as the victim's clothing, a towel, and a wet wipe. (*Id.* at 68–69.) He also interviewed Ms. Smith. (*Id.* at 69.) Detective Thornton testified that based on the interview, he felt a medical examination would be necessary for the investigation and submitted the collected evidence to the Tennessee Crime Lab. (*Id.* at 70.)

Detective Thornton testified that he was also present for the forensic interview of the victim, which was conducted at Safe Harbor Child Advocacy Center on September 21, 2017. (*Id.* at 86.) A video tape of the interview was played for the jury. (*Id.* at 87.) Detective Thornton testified that following the interview, he took H.S.'s DNA using buccal swabs. (*Id.* at 83–84.) He stated he later obtained and served a search warrant for Petitioner's DNA. (*Id.* at 78–79.)

Dr. Lise Christensen, an ER physician at East Tennessee Children's Hospital, testified that she treated the victim on September 17, 2017, and performed a "physical exam and [] collect[ed] evidence for potential rape." (Doc. 11-6 at 8, 12–13.) Dr. Christensen testified that she saw signs of trauma to the victim's genital area, which she described as "an area of erythema or like an abrasion" "at the bottom of her vaginal opening" and "a little scratch" "next to her vagina." (*Id.* at 16–17.) Dr. Christensen testified that these injuries were "consistent with some kind of force or injury to that area." (*Id.* at 16.) Dr. Christensen testified that in performing a rape kit, only an external swab of the victim's genitalia was collected, because "[i]t would be very unlikely to have full penetration at [the victim's age]. (*Id.* at 18.) Dr. Christensen explained that "at her age it would be more likely that the force would be on the outside, the trauma would occur on the outside and not full penetration on the inside." (*Id.* at 20.) Dr. Christensen clarified that "full penetration" meant "full insertion." (*Id.*) Dr. Christensen stated that even at a young age, "penetration to some level" was still possible, "which would be indicated by the trauma that [the victim] [had]." (*Id.* at

16

20, 21.)  Dr. Christensen testified that the trauma she observed and documented could not have been caused by a rash nor infection; it was an injury consistent with sexual assault.  (*Id.* at 27, 30.)

Special Agent Forensic Kim Lowe, a forensic scientist from the Tennessee Bureau of Investigations, testified that she analyzed all the evidence in this case, and that testing of the external genitalia swabs "confirmed the presence of limited spermatozoa" and examination of "inside of [the victim's underwear] in the crotch region" "confirmed the presence of spermatozoa." (*Id.* at 32, 40–41.)  Special Agent Lowe also tested the buccal swabs and obtained complete DNA profiled on the victim and Petitioner "for comparison."  (*Id.* at 43).  Special Agent Lowe testified that Petitioner was a "major contributor" for the male sperm present in the victim's underwear. (*Id.* at 47.)  Special Agent Lowe also tested the external genitalia swabs, and she testified that neither Petitioner nor his male paternal relatives could be excluded as a contributor.  (*Id.* at 48.)

In sum, the jury heard that the victim disclosed details of the sexual assault to her mother, who testified that she found physical evidence that supported the victim's disclosure.  The jury heard testimony from the doctor who examined the victim shortly after the disclosure was made, and she stated that the physical examination revelated that the victim sustained trauma to her genital area in a manner that was consistent with trauma caused by a sexual assault.  The doctor also explained that full penetration is not typical with a child as young as the victim, but that some penetration was still possible at the victim's age and was indicated by the trauma the victim sustained.  There was also testimony from a forensic scientist who tested and compared the DNA profiles obtained from the victim and Petitioner with the victim's underwear and swab taken as part of the rape kit.  That DNA testing revealed that spermatozoa was located on the inside crotch area of the victim's underwear and on the external genital swab.  Further testimony confirmed that

17

Petitioner's DNA profile matched the major contributor of the DNA profile obtained from the spermatozoa.

Given this testimony, a reasonable juror could conclude that Petitioner was guilty of aggravated rape of a child and incest. Therefore, the decision rejecting these claims is not contrary to, nor does it involve an unreasonable application of, *Jackson*, nor was it based upon an unreasonable determination of facts in light of the evidence presented. Petitioner is not entitled to relief on this issue.

### B. Prosecutorial Misconduct

Petitioner next claims that "[t]he State's unreasonable determination concerning improper prosecutorial arguments subjected Mr. Smith to a fundamentally unfair trial, violating [his] Fourteenth Amendment due process rights." (Doc. 1 at 9–10.) In support of this claim, Petitioner avers the prosecutor committed prosecutorial misconduct during closing arguments by "introduc[ing] and argu[ing] false evidence[,]" "assert[ing] guilt of [Petitioner,]" "accus[ing] [Petitioner] of lying[,]" and during cross-examination by "rais[ing] prejudicial material." (*Id.*)

Petitioner raised his claims of prosecutorial misconduct during closing arguments to the TCCA. (Doc. 11-14 at 28–40.) And he raised a claim challenging the prosecutor's conduct during cross-examination, though Respondent argues he did so under a different legal theory than his federal habeas claim. (Docs. 11-14 at 40–42; 14 at 29–30.) The TCCA conducted a plain error review of all the prosecutorial misconduct arguments presented because, by Petitioner's own admission, contemporaneous objections were not made to any portion of the State's closing argument during trial. *Smith*, 2022 WL 1567280, at *4, 5.

### 1.    Closing Arguments

Petitioner argued on direct appeal that, during closing arguments, the prosecutor "introduced and argued false evidence" when she stated that semen found in the victim's underwear originated from the victim's vagina, "explicitly declar[ed]" that finding Petitioner guilty was "the decision" and that the prosecution's case is "actually what happened[,]" and "explicitly assert[ed] that the [Petitioner] lied" about raping the victim. (Doc. 11-14 at 29–40.) There was no objection at trial to any portion of the State's closing argument. *Smith*, 2022 WL 1567280, at *5.

On direct review, Petitioner conceded his failure "to make a contemporaneous objection at trial" and "request[ed] that [the appellate court] conduct a plain error review" of his prosecutorial misconduct claims. *Id.* at *4. The TCCA acknowledged that it could review an issue that had been waived for plain error under Rule 36(b) of the Tennessee Rules of Appellate Procedure. *Id.* It noted that, under Tennessee law, relief may be granted under plain error review only where a defendant establishes:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law has been breached; (c) a substantial right of the accused has been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*Id.* at *5 (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)).

As to Petitioner's allegations that the State "introduced and argued false evidence" and "improperly declared him guilty," the TCCA determined that Petitioner "failed to prove that the State breached a clear and unequivocal rule of law" and he was therefore "not entitled to plain error relief." *Id.* at *6. As to Petitioner's allegation that the prosecutor "accused him of lying," the appellate court noted that the prosecutor stated in closing: "[Petitioner] says he detests lying, hates it, loathes it, can't stand it, detests lying, but he lies to [Mrs. Smith] about raping [H.S.] and

19

then says let's get our story straight." *Id.* The TCCA noted this evidence was mischaracterized, as Petitioner testified that "he sarcastically told Mrs. Smith he 'did it,' in regard to assaulting H.S." *Id.* But the court found that "consideration of the error is not necessary to do substantial justice given the overwhelming proof" of Petitioner's guilt. *Id.*

In Tennessee, failure to contemporaneously object constitutes a waiver of that issue on appeal. *See* Tenn. R. App. P. 36(a). The Supreme Court has held that a state's contemporaneous-objection rule constitutes "an independent and adequate state procedural ground[.]" *Wainwright,* 433 U.S. at 86–87. The Sixth Circuit has "recognized the adequacy of Tennessee's contemporaneous objection rule" and found the rule "firmly established and regularly followed." *Mathis v. Colson,* 528 F. App'x 470, 475 (6th Cir. 2013) (citations omitted). The TCCA's plain-error review is an acknowledgment of Petitioner's procedural default and "does not constitute a waiver of state procedural default rules." *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz,* 869 F.2d 281, 284–85 (6th Cir. 1989)); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001) ("[W]e view a state appellate court's review for plain error as the enforcement of a procedural default."). Accordingly, Petitioner's claims of prosecutorial misconduct during closing arguments are procedurally defaulted.

Petitioner does not establish cause and prejudice for these defaulted claims, or that a fundamental miscarriage of justice would result if the Court failed to review them on their merits. Nonetheless, the Court notes that under the test for prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' [misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642 (1974)). The Supreme Court has emphasized that a habeas court's review is "the narrow one of due process, and not the broad

exercise of supervisory power." *Id.* (quoting *Donnelly*, 416 U.S. at 642). Plus, the prosecutor's conduct is reviewed in the context of the entire trial record. *Donnelly*, 416 U.S. at 639–43. Therefore, "to make out a prosecutorial misconduct claim, one must first demonstrate that the prosecutor's conduct and remarks were improper, and then must demonstrate that the impropriety was flagrant and thus violated the [Petitioner]'s due process rights." *Hamilton v. Jackson*, 416 F. App'x 501, 506 (6th Cir. 2011) (citing *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002)). "Flagrancy is analyzed by weighing [1] whether the prosecutor's conduct tended to mislead the jury or prejudice the accused, [2] whether it was isolated or extensive, [3] whether it was deliberate or accidental, and [4] the strength of the evidence against the defendant." *Id.* (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).

None of the comments Petitioner complains of rise to the level of prosecutorial misconduct. The prosecutor's statement that the sperm in the victim's underwear came from the victim's vaginal canal was a permissible inference from the evidence presented at trial. *See United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008); *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.1996) (noting prosecutors "must be given leeway to argue reasonable inferences from the evidence"). The prosecutor's statements regarding "what actually happened" occurred while the prosecutor was restating the evidence that had been presented by Mrs. Smith, while her declaration that "[t]his is guilty" occurred during an analysis of what she believed the proof showed. (*See* Doc. 11-7 at 32–38.) Pointing out evidence in the record that conflicts the accused's statements is within the bounds of permissible argument. *See, e.g., United States v. Acosta*, 924 F.3d 288, 302 (6th Cir. 2019). And finally, the prosecutor's mischaracterization of Petitioner's testimony did not render "the entire trial fundamentally unfair" so as to constitute prosecutorial misconduct, particularly in light of the "abundant" evidence of Petitioner's guilt in combination with the trial

judge's instruction to the jury that arguments of counsel were not evidence, and that the jury should disregard any statements they believed were not supported by the evidence. (Doc. 11-7 at 40–41.) *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). Therefore, the Court finds Petitioner has failed to establish a constitutional violation or plain error under State law sufficient for this Court to find he was actually prejudiced by these comments. Petitioner is not entitled to habeas relief as to these claims.

### 2. Cross-Examination

Petitioner next states that his due process rights were denied when, "during cross-examination, A.D.A. Strange raised irrelevant material of a prejudicial nature that stigmatized Mr. Smith. Such testimony was manipulated and used to exploit the jury." (Doc. 1 at 10[3].) On direct appeal, Petitioner argued that the prosecution had him read isolated, prejudicial portions of letters he had written his wife[4] and included "extraneous" and "unredacted material about additional false allegations by the [Petitioner]'s wife . . . as well as inclusion of information about escape." (Doc. 11-14 at 40–42.) Acknowledging his lack of contemporaneous objection, Petitioner asked the TCCA to find "the trial court committed plain error when it permitted the State to cross-examine [Petitioner] with 'irrelevant material of a prejudicial nature meant to stigmatize [Petitioner]." *Smith*, 2022 WL 1567280, at *7. The TCCA reviewed the claim as follows:

> The State cross-examined [Petitioner] with letters he wrote to his father-in-law and wife. In the letters, [Petitioner] provided possible explanations for how his sperm got on H.S.'s underwear. The State asked [Petitioner] to read a portion of the letter

---

[3] Respondent argues that this claim is insufficiently plead and subject to dismissal under Habeas Rule 2(c). (Doc. 14 at 28–29.) But the Court declines to dismiss the claim under Habeas Rule 2(c), as Petitioner's memorandum in support of his petition makes it clear his federal claim is the same one presented in State court. (*See* Doc. 2 at 39–42.)

[4] As the TCCA noted, Petitioner's appeal referenced a letter to his father-in-law, but "[t]he relevant portions of text on appeal are from [Petitioner]'s letter to his wife." *Smith*, 2022 WL 1567280, at *4 n.3.

to his wife which stated, "If anything, the evidence could have gotten there unintentionally if it was on your hands. I supposed it's also possible as corrupt as Cocke County is that it was planted or falsified." [Petitioner] chose to testify on his behalf and "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). [Petitioner]'s explanations provided the jury with valuable information to determine his credibility. The State has not breached a clear and unequivocal rule of law and [Petitioner] is not entitled to plain error relief.

*Id.* There was no discussion of any federal constitutional violation in the appellate court's limited plain-error review on this point. *Id.* As such, Respondent argues that Petitioner's federal habeas claim is procedurally defaulted, as it rests upon a different legal theory than his State-court claim. (Doc. 14 at 29–30.) *See also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (holding to fairly present a claim to a state court, a petitioner must assert both the legal and factual basis for his or her claim); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir.1984) (holding a "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law").

But Petitioner presented the TCCA with a claim that his due process rights were violated by the prosecution's introduction of portions of the letters. (Doc. 11-14at 28–29, 40–42.) And he raises this claim as prosecutorial misconduct violating his due process rights in his federal petition. (Doc. 1 at 10; Doc. 2 at 34–35, 39–41.) Therefore, the Court disagrees that Petitioner procedurally defaulted this claim by not fully and fairly presenting it to the State courts.

But, as noted above, the TCCA's plain-error review is an acknowledgment of Petitioner's procedural default in failing to raise a contemporaneous objection at trial and "does not constitute a waiver of state procedural default rules." *Seymour*, 224 F.3d at 557; *Hinkle*, 271 F.3d at 244. Accordingly, Petitioner's claims of prosecutorial misconduct during the cross-examination of Petitioner are procedurally defaulted. And while Petitioner does not present an argument for why the procedural default should be excused, the Court nonetheless finds that Petitioner has failed to

23

establish a constitutional violation or plain error under State law sufficient for this Court to find he was actually prejudiced by these comments.

Petitioner testified in his own defense, and he testified that his wife planted the DNA evidence. (Doc. 11-6 at 84, 87.) As the TCCA noted, Tennessee law permits a witness to "be cross-examined on any matter relevant to any issue in the case." Tenn. R. Evid. 611(b). The prosecutor challenged the credibility of that defense by having Petitioner read portions of letters he wrote in which he attempts to "reason[] away" the DNA evidence found on the victim. (*Id.* at 87–99.) And it has long been the law that it is permissible on cross-examination to bring out facts "tending to discredit the witness by showing that his testimony in chief was untrue or biased[.]" *Alford v. United States*, 282 U.S. 687, 691–92 (1931). Moreover, the letters were admitted into evidence in their entirety and were made available to the jury as exhibits. (Doc. 11-8 at 49–60.) Accordingly, the introduction of portions of these letters by the prosecution, even if improper, did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citation omitted). Petitioner is not entitled to habeas relief as to this claim.

### C.    Ineffective Assistance of Counsel

Petitioner next claims that "[t]he State's decision regarding trial counsel's deficient performance was an unreasonable application of *Strickland's* standard, thereby denying [Petitioner]'s Sixth Amendment right to effective assistance of counsel." (Doc. 1 at 12.) Federal courts examine ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy a conjunctive, two-pronged test to establish the constitutionally ineffective assistance of counsel: (1) he must demonstrate constitutionally deficient performance by counsel; and (2) he must demonstrate actual

prejudice as a result of such ineffective assistance. *Id*. at 687. Deficiency is established when a petitioner can demonstrate that counsel's performance fell below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687–88. But a reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight[.]" *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id*. at 687, 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the outcome. *Id*. at 691.

Respondent states that it appears Petitioner raises only a claim of ineffective assistance of counsel based on trial counsel's investigation, despite having raised numerous grounds of ineffective assistance on direct appeal. (Doc. 14 at 30.) But Petitioner' memorandum in support of his petition states that counsel rendered ineffective assistance in four categories: her investigation, her failure to retain witnesses, in her deficient cross-examinations, and by exhibiting "other prejudicial deficiencies." (Doc. 2 at 45–60.) Thus, all these claims are part of Petitioner's federal habeas petition. *See Dye v. Hofbauer*, 546 U.S. 1, 4 (2005) (treating brief appended to habeas petition as part of petition under Rule 10(c) of the Federal Rules of Civil Procedure); *see also* Rule 12, Rules Governing Section 2254 Cases in the United States District Courts ("Habeas

Rule(s)") ("The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules.").

The TCCA reviewed Petitioner's ineffective assistance of counsel claims for plain error and found Petitioner was not entitled to relief.[5]  *Smith*, 2022 WL 1567280, at *10.  The TCCA agreed with the State that because Petitioner failed to raise the ineffective assistance of counsel in his motion for a new trial or develop proof on the subject at his hearing on the motion, there was "simply nothing in the record" for review.  *Id.*

As the Court previously noted, plain error review "does not constitute a waiver of state procedural default rules," *Seymour*, 224 F.3d at 557, and these claims are procedurally defaulted, *Hinkle*, 271 F.3d at 244.  Nonetheless, for the reasons that follow, Petitioner has failed to establish that he was prejudiced by trial counsel's conduct, either to overcome the procedural default of these claims or to establish the prejudice prong of the *Strickland* analysis.

Following Petitioner's sentencing, he filed, with the assistance of trial counsel, a motion for a new trial.  (Doc. 11-1 at 56–57.)  Before the motion for a new trial was heard, however, Petitioner filed a pro se notice of appeal with the TCCA.  (*See* Doc. 11-11 at 2.)  Trial counsel filed a motion to stay that action, which was granted.  (*Id.*)  Petitioner also filed documents with trial counsel and the TCCA stating that he did not want trial counsel to represent him.  (*Id.* at 2–3.)  The issue of whether Petitioner wished to waive his right to counsel was addressed at a post-judgment hearing on October 1, 2019.  (*Id.*)  The trial judge questioned Petitioner extensively; gave "strong advi[c]e" to Petitioner to retain counsel; stated that Petitioner would have the

---

[5] Petitioner presented the State court with each of the categories of alleged deficient performance that he presents in his federal petition, although he presents in this Court numerous sub-claims that were not presented to the State court.  (*Compare* Doc. 11-14 at 58–67 *with* Doc. 2 at 45–60.)

opportunity to challenge trial counsel's performance was on post-conviction review if the case got to that phase; and provided the reasons why he thought it "unwise" of Petitioner to try to represent himself. (*Id.* at 4–19.)  At the conclusion of the trial judge's questioning, Petitioner waived his right to be represented by counsel and elected to pursue post-judgment proceedings pro se. (Doc. 11-1 at 59, 60; Doc. 11-11 at 20[6].)

After numerous continuances, Petitioner filed an amended motion for a new trial. (Doc. 11-1 at 95–96.)  Ineffective assistance of trial counsel was not a claim raised in the amended motion. (*Id.*)  A hearing was held on Petitioner's motion for a new trial on February 22, 2021. (Doc. 25-1.)  The trial judge asked Petitioner whether he still intended to represent himself, and Petitioner stated that he did. (*Id.* at 3.)  Petitioner did not develop or present any evidence to support his ineffective assistance claims at the hearing on the motion for a new trial. (*See, generally*, Doc. 25-1.)  Nonetheless, Petitioner presented several claims of ineffective assistance of trial counsel to the TCCA on direct review. (Doc. 11-14 at 58–67.)

Under the State-court record, there is no evidence to establish a *Strickland* claim, as the TCCA reasonably determined.  Moreover, assuming his ineffective assistance of counsel claims would not be deemed previously determined under State law, Petitioner could have pursued his federal claims through post-conviction proceedings but chose not to do so.[7]  Regardless, any absence of proof from the State-court record is explained by, and due to, Petitioner's negligence in not developing proof when the opportunity was available to him.

---

[6] Trial counsel also noted at this hearing that Petitioner would need to file paperwork to request his trial transcript. (Doc. 11-11 at 27.)

[7] The Court notes that State-court remedies are no longer available to Petitioner due to the statute of limitations for filing a petition for post-conviction relief.  *See* Tenn. Code Ann. § 40-30-102.

27

At this stage, Petitioner may not seek further evidentiary development regarding his ineffective assistance of counsel claims unless he satisfies one of the narrow circumstances of § 2254(e)(2). Petitioner cannot do so, because his allegations implicate no new constitutional law, and the factual predicates of these claims were known at the time of trial.

Therefore, Petitioner's ineffective assistance of counsel claims are procedurally defaulted. And Petitioner has not established any actual prejudice in this case, as there is no proof in the record that the proceedings would have resulted differently but for trial counsel's conduct. Furthermore, in light of the sufficiency of evidence determination by the State court regarding Petitioner's guilt, Petitioner cannot demonstrate that he is actually innocent. Accordingly, Petitioner is not entitled to habeas relief with regard to his claims that trial counsel rendered ineffective assistance.

### D.     Cumulative Error

Lastly, Petitioner claims that "[t]he State's unreasonable determination of the aggregate effect of multiple errors substantially prejudiced the [Petitioner], denying his right to due process and rendering the trial fundamentally unfair." (Doc. 1 at 14.) In support of this claim, Petitioner states that he "is not petitioning for cumulative review of individually raised errors in the habeas petition, but of the individual issues of cumulative error itself, as raised in the [S]tate court, that violates the Due Process Clause of the Fourteenth Amendment." (*Id.*) He additionally alleges that "[t]he State court unreasonably determined in its review for cumulative error that there were no errors and therefore no cumulative effect that would violate Mr. Smith's due process rights. The court's failure to acknowledge a cumulative error violation deprived Mr. Smith his right to a fair trial." (*Id.* at 14–15.)

28

But cumulative error claims are not cognizable on federal habeas review, because there is no Supreme Court precedent that "constitutional claims can be cumulated to grant habeas relief[.]" *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief.").

Additionally, the TCCA determined that, based on the individual errors alleged on direct review, Petitioner was not entitled to relief, holding that "[n]o error at all renders a cumulative error claim barren." *Smith*, 2022 WL 1567280, at *10. And for the reasons stated throughout this Opinion, Petitioner has not proven any error, or prejudice resulting from that error, to be cumulated. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

## IV.     CERTIFICATE OF APPEALABILITY

Petitioner must obtain a certificate of appealability ("COA") before he may appeal from this decision. *See* 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added). Applying this standard, the Court concludes that a COA should be denied as to all claims raised in the petition.

## V.     CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief.  Therefore, the instant petition will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.  A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**


**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**